UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                :

JOHNNY MUNIZ,                         :
                                                :
                      Plaintiff,        :
                                                :             20 Civ. 9223 (JPC)
           -v-                         :
                                              :           <u>OPINION AND ORDER</u>
THE CITY OF NEW YORK *et al.*,      :
                                              :
                      Defendants.     :
                                              :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        Plaintiff Johnny Muniz, a former police officer for the New York City Police Department ("NYPD"), alleges discrimination and a hostile work environment on the basis of his age and race in violation of federal, state, and city law against his former employer, the City of New York, and the former Commanding Officer of his precinct, John Mastronardi. Muniz brings his claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* (the "ADEA"), the ADEA's 1990 amendments in the Older Workers Benefit Protection Act (the "OWBPA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* (the "NYCHRL"). Following the close of discovery, Defendants have moved for summary judgment on all of Muniz's claims.

        The Court grants Defendants' motion in part and denies it in part. The Court grants the motion as to Muniz's OWBPA claim, as that statute does not provide a private right of action. Similarly, to the extent Muniz brings Title VII and ADEA claims against Mastronardi, such claims are dismissed because neither statute creates liability for individual defendants. Because Muniz has not established sufficiently severe and pervasive conduct to constitute a hostile work

environment under federal law, the Court also grants Defendants' motion with respect to Muniz's hostile work environment claims under Title VII and the ADEA against the City of New York (the "City"). But genuine disputes of material fact exist with respect to the remainder of Muniz's claims, and so Defendants' motion is denied in all other respects.

## I. Background

### A. Facts[1]

Plaintiff Johnny Muniz served as a police officer for the NYPD from 1997 until his retirement in August 2020. Defts. 56.1 Stmt. ¶¶ 1, 5. He identifies as Hispanic and was born in 1970, *id.* ¶¶ 3-4, making him forty-nine or fifty years old when he retired from the NYPD. Muniz worked patrol in the 75th Precinct, which covers the East New York and Cypress Hills neighborhoods of Brooklyn, for the first fourteen years of his NYPD career, before joining that precinct's Crime Analysis Unit ("CAU") in 2011. *Id.* ¶¶ 6-7. At the time Muniz was assigned to the CAU, the Unit consisted of six to eight police officers supervised by a sergeant who reported directly to the 75th Precinct's Commanding Officer. *Id.* ¶ 12. Muniz remained assigned to the CAU until January 2020, when he was transferred back to patrol. *Id.* ¶ 7.

Defendant John Mastronardi, then a Deputy Inspector with the NYPD, became the Commanding Officer of the 75th Precinct in the spring of 2019. *Id.* ¶ 10; Pl. Counter 56.1 Stmt. ¶ 10. In that role, Mastronardi "supervised all administrative and patrol functions of the command, including the Crime Analysis Unit." Defts. 56.1 Stmt. ¶ 11. At the time that Mastronardi took

---

[1] These facts are mainly drawn from Defendants' statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 58 ("Defts. 56.1 Stmt."), Muniz's counter-statement under Rule 56.1(b), Dkt. 66 ("Pl. Counter 56.1 Stmt."), and the exhibits filed by the parties, including the transcripts of the depositions of Muniz, Dkt. 65-5 ("Muniz Dep. Tr."), and Mastronardi, Dkt. 65-6 ("Mastronardi Dep. Tr."), and the declaration from Muniz, Dkt. 65-1 ("Muniz Decl."), with its attachments. Unless otherwise noted, the Court cites only to Defendants' statement of undisputed material facts when Muniz does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add his own "spin" on the fact or otherwise dispute the inferences drawn from it.

over as the precinct's Commanding Officer, the sergeant overseeing the CAU, and therefore Muniz's direct supervisor, was Sergeant Michael A. Drescher.  *Id.* ¶ 13.  At some point in 2019, Sergeant Drescher was replaced in that role by Sergeant David M. Persson, who then became Muniz's immediate supervisor.  *Id.* ¶ 14.

Muniz testified at his deposition that, in May 2019, Mastronardi convened his first precinct meeting, which was attended by about half of the precinct's employees.  *Id.* ¶ 73; Muniz Dep. Tr. at 101:8-11.  During this meeting, Mastronardi announced to the employees present, "if you have time on don't think you're going to just sit around and not do nothing."  Defts. 56.1 Stmt. ¶ 73; Muniz Dep. Tr. at 101:11-13.  According to Muniz, at the same meeting, Mastronardi apparently also said, "[f]or all you senior officers who think you are just going to sit around, wait to retire and not work, it's not going to happen," and then made direct eye contact with Muniz.  Pl. Counter 56.1 Stmt. ¶ 78; Muniz Dep. Tr. at 145:10-146:16.  Muniz further testified that he learned about comments Mastronardi had made about him from both Sergeant Drescher and Sergeant Persson. Muniz Dep. Tr. at 90:23-91:16, 149:5-24, 172:23-175:7; *see* Pl. Counter 56.1 Stmt. ¶ 78.  Sergeant Drescher informed Muniz that Mastronardi remarked that Muniz had "been doing this for a long time" and might be "interested in doing something else," and Sergeant Persson related that Mastronardi complained about Muniz "sleeping in a corner."[2]  Defts. 56.1 Stmt. ¶¶ 74-75; Muniz Dep. Tr. at 149:9-24.

---

[2] The parties disagree as to the admissibility of these comments from Sergeant Drescher and Sergeant Persson.  *See* Dkt. 56 ("Motion") at 15; Dkt. 64 ("Opposition") at 14.  Defendants simply say the comments are "inadmissible hearsay" that cannot prevent summary judgment, without any further analysis.  Motion at 15; Dkt. 71 ("Reply") at 8.  Muniz maintains that Sergeant Drescher's and Sergeant Persson's recounting of Mastronardi's statements are admissible for multiple reasons.  Opposition at 14-16.  As to the first potential layer of hearsay, *see* Fed. R. Evid. 805, Muniz argues that Mastronardi's remarks to the two sergeants are not hearsay because such negative comments are not offered for the truth of the matter asserted and further because they were made by a party opponent in Mastronardi.  Opposition at 14 (citing, first, *Krause v. Kelahan*, 575 F. Supp. 3d 302, 311 (N.D.N.Y. 2021), and then Fed. R. Evid. 801(d)(2)(A) (other citations omitted)).  Then, Muniz argues, the statements by Sergeant Drescher and Sergeant Persson

Muniz testified that his work in the CAU was generally the same each day. *Id.* ¶ 20. Muniz and his colleagues would spend their days working on their crime analysis reports, with a final package of reports delivered to Mastronardi each Tuesday. *Id.* ¶ 16. Muniz was responsible for generating "shots-fired" reports, which were Excel spreadsheets with information on shooting incidents in the 75th Precinct. *Id.* ¶ 15. Mastronardi then would digest and analyze the reports and use them to "implement[] . . . crime-prevention strategies" and "for presentations at CompStat meetings at NYPD's headquarters once every four to six weeks, as well as at borough-level meetings on a more frequent basis." *Id.* ¶¶ 16-17. The parties disagree as to the degree of Mastronardi's daily involvement in the work of the CAU, and whether Mastronardi changed aspects of the reports that CAU members were required to generate after he took over as the precinct's Commanding Officer. *See id.* ¶¶ 18-19, 21-22; Pl. Counter 56.1 Stmt. ¶¶ 18-19, 21-22. The parties further disagree as to whether Muniz encountered difficulty completing his work for Mastronardi and as to whether Mastronardi was satisfied with Muniz's work. *See* Defts. 56.1 Stmt. ¶¶ 23-25; Pl. Counter 56.1 Stmt. ¶¶ 23-25. During Mastronardi's tenure as Muniz's Commanding Officer, Muniz received only one evaluation, Defts. 56.1 Stmt. ¶ 45, which was conducted by Sergeant Drescher and reviewed by Lieutenant Atara Ashford, *id.* ¶ 46.

Muniz identifies certain actions by Mastronardi that, Muniz contends, specifically excluded him on the job. Muniz contends that Mastronardi left him off of work-related group text messages, though Muniz acknowledges that he never missed an assignment as a result and that he

---

communicating Mastronardi's remarks to Muniz are admissible as statements of a party opponent's agent under Rule 801(d)(2)(D), as excited utterances under Rule 803(2), and as impeachment given Mastronardi's denial of making those remarks. *See* Opposition at 15-16. Defendants do not respond to these arguments. *See generally* Reply. The Court therefore will consider Muniz's deposition testimony regarding Sergeant Drescher's and Sergeant Persson's statements in evaluating Defendants' motion for summary judgment, but does not reach whether either statement will be admissible at trial or, if so, for what purpose, whether for substantive evidence or only to impeach Mastronardi.

did receive at least one or two work-related group text messages from Mastronardi.  Defts. 56.1 Stmt. ¶¶ 41-43.  The parties also disagree about whether Mastronardi, as a general practice, would communicate assignments via text, including the frequency of such texts and whether the texts would be sent to all members of the CAU or only to those for whom he was assigning a particular task.  *Id.* ¶ 44; Pl. Counter 56.1 Stmt. ¶ 44.  Muniz also testified that Mastronardi excluded him from a December 2019 precinct-wide Christmas party by telling him he "wasn't going."  Defts. 56.1 Stmt. ¶ 48.  Yet Muniz acknowledged that he did not attend this holiday party not only because he did not feel welcome at the event, but also because of child-care issues and because his wife did not want him to go.  Defts. 56.1 Stmt. ¶ 49.  Muniz additionally testified that Mastronardi excluded him from a January 2020 team dinner in similar fashion, *i.e.*, by telling Muniz he "wasn't going," though ultimately Sergeant Drescher was the only member of the CAU who attended that dinner.  *Id.* ¶¶ 50-51.  Defendants dispute Muniz's contentions regarding the holiday party and dinner, and Mastronardi testified that Muniz in fact was invited to both events.  *Id.* ¶ 52.

On January 29, 2020, Mastronardi made the unilateral decision to transfer Muniz to a patrol assignment, an action that fell within Mastronardi's authority.  *Id.* ¶¶ 26, 28.  The parties disagree as to the circumstances of this transfer and the reasons for it, including whether Muniz's preparation of a sub-par shots-fired report that Mastronardi relied on at a CompStat meeting prompted the transfer decision.  *Id.* ¶¶ 27, 29-30, 32; Pl. Counter 56.1 Stmt. ¶¶ 27, 29-30, 32.  But regardless of what triggered the transfer, the parties agree that later in the day on January 29, 2020, Lieutenant Ashford called Muniz and told him "that he could have the patrol job of his choice," to which Muniz replied that "it was late, his wife was sleeping, and [] he would have to discuss it with her."  Defts. 56.1 Stmt. ¶ 33.  The next day Muniz, having not yet informed Lieutenant Ashford of his patrol assignment selection, was assigned to the prisoner transport team in the morning and then a foot post on the Brooklyn Bridge in the afternoon.  *Id.* ¶ 35; Muniz Dep. Tr. at

183:10-184:22.  Muniz testified that after he returned to the precinct, Lieutenant Ashford again asked Muniz what patrol position he desired, to which Muniz responded that he "would probably retire instead of transferring to patrol."  Defts. 56.1 Stmt. ¶ 36.  Muniz also testified that he never requested a specific position, *id.* ¶ 38, and that he then used his accrued leave before retiring from the NYPD in August 2020, *id.* ¶ 37.

The parties agree that Muniz's transfer to a patrol assignment did not impact his job title, which remained "police officer," nor did it reduce his compensation, although Muniz considered the transfer to be "extraordinarily demeaning."  *Id.* ¶¶ 66, 70-71.  Muniz understands that he was replaced at the CAU by someone with "prior crime-analysis experience at both the precinct-level and at NYPD's headquarters."  *Id.* ¶ 40.  Another police officer assigned to the CAU, Casey Hyatt, was transferred to patrol at the same time as Muniz.  *Id.* ¶ 54.  Officer Hyatt is Caucasian and was born in 1979, and Mastronardi similarly perceived Officer Hyatt to be white and younger than Muniz.  *Id.* ¶¶ 56-57, 59.

## B.    Procedural History

Muniz commenced this action on November 3, 2020, bringing claims for race and age discrimination and hostile work environment under federal law. Dkt. 1 ("Compl.") ¶¶ 37-86.  His Complaint alleges the following nine causes of action: (1) age discrimination against the City in violation of the ADEA and the OWBPA, *id.* ¶¶ 37-42; (2) age discrimination against both Defendants in violation of the NYSHRL, *id.* ¶¶ 43-49; (3) age discrimination against both Defendants in violation of the NYCHRL, *id.* ¶¶ 50-54; (4) creation of a hostile work environment in violation of federal law,[3] *id.* ¶¶ 56-60; (5) creation of a hostile work environment against both

---

[3] Muniz's federal hostile work environment claim does not specify under which federal statute it is brought, *see* Compl. ¶¶ 56-60, but the Court assumes that Muniz intends to bring it under the ADEA and Title VII, as those are the statutes discussed in Muniz's briefing, *see* Opposition at 23.

Defendants in violation of the NYSHRL, *id.* ¶¶ 62-66; (6) creation of a hostile work environment against both Defendants in violation of the NYCHRL, *id.* ¶¶ 67-71; (7) discrimination based on ethnicity in violation of Title VII, *id.* ¶¶ 72-76; (8) discrimination based on ethnicity against both Defendants in violation of the NYSHRL, *id.* ¶¶ 77-81; and (9) discrimination based on ethnicity against both Defendants in violation of the NYCHRL, *id.* ¶¶ 82-86.[4]

Defendants answered the Complaint on February 3, 2021.  Dkt. 13.  After an unsuccessful attempt at mediation, Dkt. 22, and multiple extensions of the parties' discovery deadlines, Dkts. 27, 29, 31, 34, 38, 42, 44, Defendants moved for summary judgment on each of Muniz's claims on October 18, 2022, Dkts. 55, 56, 57-58.  Muniz opposed that motion on December 9, 2022. Dkts. 64-66.  Defendants filed a reply on January 27, 2023.  Dkt. 71.

## II.  Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[4] Muniz's first cause of action is titled "Age Discrimination – Disparate Treatment – Federal Claim against the City of New York," yet the allegations for this cause of action refer to "Defendants" in the plural.  There is no individual liability under the ADEA, however.  *See Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011) ("[D]ismissal of the Title VII and ADEA claims against the individual Defendants was appropriate as neither statute subjects individuals, even those with supervisory liability over the plaintiff, to personal liability."); *see also Williams v. N.Y.C. Dep't of Educ.*, No. 17 Civ. 1996 (AJN), 2018 WL 4735713, at *4 (S.D.N.Y. Sept. 29, 2018) (collecting cases).  Similarly, the titles of Muniz's fourth cause of action for a federal hostile work environment and his seventh cause of action for discrimination based on ethnicity in violation of Title VII do not specify against which Defendants the claims are brought, yet the allegations for these causes of action too refer to "Defendants" in the plural.  There also is no individual liability for federal hostile work environment and ethnicity discrimination claims.  *See Guerra*, 421 F. App'x at 17; *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) ("The district court also properly dismissed the Title VII claims against Glowski and Paluck, because individuals are not subject to liability under Title VII.").  On August 15, 2023, the Court issued an Order which, *inter alia*, directed Muniz to clarify which causes of action he is pursuing against both the City and Mastronardi.  Dkt. 72.  On August 22, 2023, Muniz advised that he is pursuing the first, fourth, and seventh causes of action against only the City.  Dkt. 73.  Accordingly, to the extent the Complaint could be construed as bringing the first, fourth, and seventh causes of action against both Defendants, those causes of action are dismissed as to Mastronardi.

56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings."  *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[A] nonmoving part[y] . . . may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences,

or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted).

### III.   Discussion

#### A.   OWBPA Claim

Muniz's first cause of action alleges discrimination in violation of the ADEA and the OWBPA.  Compl. ¶ 39.  Defendants argue that the OWBPA does not provide a private right of action for age discrimination and merely governs waiver of such claims under the ADEA.  Motion at 3-4.  There is no suggestion by the parties that Muniz has waived any ADEA claim.  *See id.* at 4; Opposition at 3.  To the extent Muniz is attempting to bring a separate claim under the OWBPA in his first cause of action, as opposed to simply asserting that his ADEA claim has not been waived, the Court grants Defendants' motion for summary judgment with respect to such a claim because the OWBPA does not provide an independent right of action to Muniz.  *See Craven v. City of New York*, No. 20 Civ. 8464 (ER), 2022 WL 2967310, at *3 (S.D.N.Y. July 27, 2022) (collecting cases).

#### B.   Muniz's Testimony

Defendants argue that Muniz's testimony, on its own, is insufficient to create triable issues of fact.  Motion at 11-12; Reply at 8.  Muniz disagrees.  Opposition at 2.

In some cases, a "Plaintiff's deposition testimony is simply self-serving testimony that cannot be used to defeat summary judgment."  *Beauvoir v. Falco*, 345 F. Supp. 3d 350, 367 n.5 (S.D.N.Y. 2018) (citing *Fincher v. Depository Tr. & Clearing Corp.*, No. 06 Civ. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008), *aff'd*, 604 F.3d 712 (2d Cir. 2010)); *Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 258 n.15 (S.D.N.Y. 2008) ("Plaintiffs' self-serving and unsubstantiated deposition testimony is insufficient to create a triable issue of fact . . . .").  But in other situations, a "plaintiff's testimony alone may be independently sufficient to raise a genuine

issue of material fact." *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019).  While the Second Circuit has noted that a district court may disregard a plaintiff's unsubstantiated testimony "in the rare circumstance" that the testimony is "contradictory and incomplete" and "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations," *Jeffreys*, 426 F.3d at 554-555 (internal quotation marks omitted), a district court should rely on a plaintiff's stand-alone testimony that it is "consistent and uncomplicated," and not "wholly improbable," *Bellamy*, 914 F.3d at 746.

Having reviewed Muniz's testimony in the form of his declaration, Dkt. 65-1, and his deposition testimony, Dkt. 65-5, the Court finds it to be consistent, uncomplicated, and not wholly improbable.  Because that testimony is not replete with inconsistencies and improbabilities such that no reasonable juror could credit it, it may be used to create a genuine issue of material fact.

## C.    Federal Discrimination Claims

Title VII and ADEA claims of workplace discrimination are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (Title VII); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (ADEA).  To succeed under this framework, "a plaintiff must first demonstrate a *prima facie* case of employment discrimination by showing that: '(1) she was within the protected class;[5] (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'"  *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019)).

---

[5] Title VII prohibits discrimination on the basis of ethnicity or race while the ADEA prohibits discrimination on the basis of age against persons aged 40 or older.  *See, e.g.*, *Vill. of Freeport v. Berrella*, 814 F.3d 594, 606 (2d Cir. 2016) (Title VII); *D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 194 (2d Cir. 2007) (ADEA).

"[O]nce a plaintiff produces minimal evidentiary support for the claim of discriminatory motivation, the burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). "When the employer meets its burden, the plaintiff can no longer rely on the prima facie case, but must prove that the employer's proffered reason was a pretext for discrimination," which a plaintiff can do in the ADEA context "by presenting facts, which taken in [her] favor suffice to show that a triable issue exists as to whether [her] age was a 'but for' cause of [her] termination." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (internal quotation marks, brackets, and ellipsis omitted). In the Title VII context, a plaintiff must only prove "that the adverse employment decision was motivated at least in part by an impermissible reason, *i.e.*, a discriminatory reason." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (internal quotation marks omitted).

Defendants argue that Muniz has failed to establish a *prima facie* case of discrimination because he has not suffered an adverse employment action, Motion at 6-11, and because he has not set forth circumstances giving rise to an inference of discrimination, *id.* at 12-19. Defendants also argue that they had a legitimate, non-discriminatory reason for Muniz's transfer from the CAU to patrol and that Muniz cannot establish that this reason was pretextual. *Id.* at 20-21.

### 1.     Adverse Employment Action

An adverse employment action is a "materially adverse change" in the terms of employment. *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). The employment action "must be more disruptive than a mere inconvenience or alteration of job responsibilities." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). Examples "include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or

other indices unique to a particular situation." *Id.* (ellipsis omitted).

Muniz points to two potential adverse employment actions.  The first is his transfer from the CAU to patrol, Opposition at 4-8, the second is his exclusion on approximately twenty-three instances from "group texts relating to active cases and other pertinent information within the CAU," *id.* at 8.  Muniz also cites other events which he claims collectively, and when combined with the other two actions, "constitute adverse employment action(s) in the aggregate," to include two occasions when Mastronardi invited "the entire CAU to a social event and then clarif[ied] that Plaintiff was not invited," Mastronardi  "disparag[ing] Plaintiff behind his back to his supervisors," and an instance when Mastronardi made "direct eye contact with Plaintiff while making an ageist comment in a speech to the precinct."  *Id.* at 9.

### i.      Transfer to Patrol Duty

Defendants argue that Muniz's transfer was not an adverse employment action because it "was not considered a demotion in rank or a form of punishment, nor did it result in a reduction in Plaintiff's compensation or benefits," because it did not result in a reduction of Plaintiff's promotion chances, and because Muniz has expressed only a subjective dissatisfaction with the reassignment.  Motion at 7-9.

While "subjective dissatisfaction with assignments does not constitute adverse employment action," *Harge v. City of New York*, No. 16 Civ. 5160 (LJL), 2021 WL 3855305, at *9 (S.D.N.Y. Aug. 26, 2021), *aff'd in relevant part*, 2022 WL 17481819 (2d Cir. Dec. 7, 2022), and "a lateral transfer does not rise to the level of adverse employment action as a matter of law," *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005), "unsatisfactory work assignments and changes in job responsibilities [may] rise beyond the level of workplace grievances to become adverse employment actions if they are accompanied by material changes in the terms and conditions of employment that would themselves constitute adverse employment

actions," *Harge*, 2021 WL 3855305, at *9; *see also Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002) ("A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way.").  Put another way, in cases involving involuntary transfers, the Second Circuit has "held that an adverse employment action can exist when an employee's new assignment is materially less prestigious, materially less suited to his skills and expertise, or materially less conductive to career advancement."  *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008) (internal quotation marks omitted).

Muniz spent the first fourteen years of his career on patrol before his assignment to the CAU.  Pl. Counter 56.1 Stmt. ¶ 6.  And he does not deny that his title remained the same after he was placed back on patrol, *id.* ¶ 70, that his transfer back to patrol did not reduce his compensation or benefits, *id.* ¶ 71, and that roughly 90% of the police officers in the 75th Precinct were assigned to patrol duties, *id.* ¶ 64.  He testified, however, that he personally found the transfer "extraordinarily demeaning" because he felt like the transfer was punishment as typically when an officer has an assignment for administrative work or a detail "and they do something wrong," the officer is assigned to patrol.  Muniz Dep. Tr. at 168:19-169:13.  While Defendants argue that no objective evidence supports Muniz's perception of the significance of this transfer, Motion at 8-9, the evidentiary record suggests otherwise.  Muniz has produced communications from other current or former members of the 75th Precinct expressing similar views that Muniz's transfer was in effect a demotion or punishment.  Officer Adam Donegan told Muniz his transfer back to patrol was "not right," Pl. Counter 56.1 Stmt. ¶ 85; Dkt. 65-19, another officer told Muniz's wife that "it's messed up what the CO [*i.e.*, Commanding Officer] did, he's a real piece of shit," Muniz Decl. ¶ 34; Dkt. 65-3; a former officer, Charles Martin, texted Muniz that "the CO is nuts for

13

kicking you back to patrol, you don't deserve that shit . . . I'm sorry this happened to you," Muniz
Decl. ¶ 35; Dkt. 65-4; and Muniz's direct supervisor, Sergeant Drescher, told Muniz in text
messages that "what the CO did was uncalled for and ridiculous" and "your work ethic was on
point don't ever think it wasn't!! I know and so does everyone in the office," Dkt. 65 ¶ 16; Dkt.
65-17.  Another officer, Derek Rochez, apparently retired rather than being placed on patrol.
Muniz Dep. Tr. at 112:6-7.  Moreover, Muniz had spent the eight to nine years prior to his transfer
to patrol doing entirely different work in the CAU, which was a significantly rarer post than patrol,
Defts. 56.1 Stmt. ¶¶ 7, 64, and utilized different skills, some of which Muniz had developed from
his prior education, training, and experience, Muniz Decl. ¶ 7 ("In the CAU, I was responsible for
preparing crime reports.  Preparing these reports required me to organize and apply data in
spreadsheets hundreds of pages long.  I excelled in this role as it heavily involved the skills I had
developed from my education, training, and experience in accounting, auditing, and
bookkeeping.").  Indeed, Mastronardi testified at his deposition that another officer was transferred
out of the CAU to patrol because "he couldn't handle the type of analytical work and data mining,
and I told him maybe it was better to go back to the street.  It's not for everybody—crime analysis."
Mastronardi Dep. Tr. at 82:18-22.  This evidence indicates that the transfer of Muniz to patrol
placed him in what was considered a less prestigious position and one that made use of entirely
different skills than his position in the CAU.  This evidence sufficiently establishes a question of
fact as to whether Muniz's transfer to patrol was a materially adverse action.  *See Patrolmen's
Benevolent Ass'n of City of New York*, 310 F.3d at 51-52 (holding that jury was entitled to conclude
that a transfer was adverse employment action in part because the plaintiff officer was transferred
from one precinct to another and could no longer utilize prior work training); *de la Cruz v. N.Y.C.
Hum. Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) (holding that a transfer from
one unit of a governmental organization to another was sufficiently adverse when the plaintiff

14

contended that the new unit was "less prestigious" "with little opportunity for professional growth"); *Henry v. Nassau Health Care Corp.*, No. 08 Civ. 2398 (DRH) (GRB), 2013 WL 5537125, at *7 (E.D.N.Y. Oct. 7, 2013) (finding genuine dispute of fact where a transfer "resulted in diminished responsibilities" because the "new position entailed mainly clerical tasks" and the old position entitled "negotiating managed care contracts" and further because the "new position did not require [the plaintiff's] educational background and skills").

Defendants point to the fact that the overwhelming majority of police officers at the 75th Precinct were assigned to patrol duties, Motion at 8 (citing Defts. 56.1 Stmt. ¶ 64), and argues that "no reasonable employee would think being asked to perform tasks that are part of h[is] job description constituted a materially adverse employment action," *id.* at 8 (quoting *Martin v. MTA Bridges & Tunnels*, 610 F. Supp. 2d 238, 254 (S.D.N.Y. 2009)) (alteration in original).  But this argument ignores the evidence that patrol was in fact *not* part of Muniz's job for at least eight years, so much so that other members of the precinct were surprised that Muniz was asked to do this work and expressed their views that his transfer was not right.  To be clear, the Court's holding here is not that, as a matter of law, a patrol position is a worse or less admirable role than working a desk position, or that a transfer to a patrol assignment automatically constitutes an adverse employment action.  Rather, the holding is merely that, under the specific facts presented in this case, there is a genuine dispute of fact as to whether transferring Muniz from his position within the CAU to patrol duty amounted to a materially adverse change in his employment.  And given the evidence presented as to the circumstances of Muniz's employment, a reasonable jury could find that the change was materially adverse.  Therefore, the Court declines to grant summary judgment in favor of the City on the basis that Muniz has not established an adverse employment action.

ii.        **Exclusions from Texts and Social Gatherings and Other Conduct**

Muniz further argues that Mastronardi's failure to include him on work-related group texts constituted adverse employment action, and that other conduct by Mastronardi supports a finding of adverse employment action in the aggregate.  Opposition at 8-9.  Defendants contend that none of these actions constitute adverse employment actions.  Motion at 12.[6]

Muniz argues that his exclusion from Mastronardi's assignment-related group texts to CAU members prevented him from "know[ing] what [his] assignments would be," and he claims that he "only received word of [his] assignments later on from other officers and sergeants in the unit." Muniz Decl. ¶ 19.  But Muniz is not aware of any instance in which he missed an assignment as a result of his exclusion from these group messages.  Defts. 56.1 Stmt. ¶ 43.  Instead, it appears that other members of the unit "knew of their assignments prior to coming into work for the day." Muniz Decl. ¶ 22.

Any exclusion from these group texts, to the extent it occurred,[7] does not constitute an adverse employment action.  Because Muniz ultimately learned of all his assignments in a timely manner, the exclusion was not "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Mathirampuzha*, 548 F.3d at 78.  Muniz's reliance on *Wallen v. Teknavo Group*, No. 12 Civ. 6196 (MKB) (SJB), 2018 WL 1278317 (E.D.N.Y. Feb. 22, 2018), and *Aslin v.*

---

[6] Defendants additionally argue that the evidence does not establish that Muniz was excluded from any work-related group text messages or after-hours social gatherings because the only evidence of such exclusions comes from Muniz's own testimony.  Motion at 11-12.  But as discussed at *supra* III.B, the Court has determined that Muniz's testimony may create a question of fact, even standing alone.  Further, contrary to Defendants' claim, Reply at 6, Muniz's testimony that he did not miss an assignment because of being excluded from these text messages does not contradict his testimony that he was excluded from the texts in the first place.  The Court notes as well that Mastronardi was unable to say whether Muniz was included in all of his group texts. Mastronardi Dep. Tr. at 69:4-6.

[7] As noted, there is a dispute as to whether Mastronardi would send text messages to all members of the CAU, as opposed to only those for whom he was assigning a particular task.  *See* Defts. 56.1 Stmt. ¶ 44; Pl. Counter 56.1 Stmt. ¶ 44.

*University of Rochester*, No. 17 Civ. 6847, 2019 WL 4112130 (W.D.N.Y. Aug. 28, 2019), is misplaced.  *See* Opposition at 8.  In *Wallen*, the plaintiff was excluded from work discussions, from interactions with employees of a client, and from three or four meetings.  2018 WL 1278317, at \*15.  Even still, the court held that "any one of these incidents could not itself be an adverse employment action" though the acts could be considered "along with his diminution of substantive tasks" to determine that the plaintiff suffered an adverse employment action.  *Id.  Aslin* is even less on point.  There the court stated that exclusion from meetings can sometimes be an adverse employment action *in the context of a retaliation claim*.  2019 WL 4112130, at \*9.  But the standard for an adverse employment action in that context is lower than in the discrimination context, as an adverse employment action with respect to retaliation need only be capable of dissuading a reasonable worker from making or supporting a charge of discrimination.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  In this case, Muniz's ostensible exclusion from the group texts is not material enough in itself to constitute an adverse employment action.

Muniz points to other actions by Mastronardi and argues that, even if they do not amount to adverse employment actions, "a reasonable jury can still find that these actions collectively, when combined with Plaintiff's transfer to patrol and exclusion from assignment-related group texts, constitute adverse employment action(s) in the aggregate."  Opposition at 9.  These actions consist of Mastronardi's exclusion of Muniz from a holiday party and a dinner, Defts. 56.1 Stmt. ¶¶ 50-51, which Mastronardi disputes, *id.* ¶ 52; a comment made by Mastronardi at a speech to employees at the precinct followed by making eye contact with Muniz, *see* Pl. Counter 56.1 Stmt. ¶ 78; and disparaging remarks Mastronardi made about Muniz to Sergeant Drescher and Sergeant Persson, Defts. 56.1 Stmt. ¶¶ 74-75.  *See* Opposition at 9.  The Court agrees that none of these actions were adverse employment actions.  *See Scott v. City of New York Dep't of Corr.*, 641 F.

Supp. 2d 211, 231 (S.D.N.Y. 2009) ("[V]erbal abuse is typically insufficient to constitute an adverse employment action because negative or otherwise insulting statements are hardly even actions, let alone adverse actions." (internal quotation marks and brackets omitted)), *aff'd*, 445 F. App'x 389 (2d Cir. 2011); *Bickerstaff v. Vassar College*, 354 F. Supp. 2d 276, 280 (S.D.N.Y. 2004) (under the pre-*Burlington Northern & Santa Fe Railway Co.* retaliation standard, explaining that "[e]xclusions from meetings or social functions do not constitute adverse employment actions"), *aff'd*, 160 F. App'x 61 (2d Cir. 2005).

The Court further rejects Muniz's argument that Mastronardi's comments and exclusion of Muniz from text messages and two social events, in the event they occurred, can be considered in conjunction with Muniz's transfer as "adverse employment action(s) in the aggregate." Opposition at 9. There is some degree of disagreement among judges in this Circuit on whether actions that are not adverse employment actions themselves can be considered together to constitute one. Some have held that individual actions which themselves are not sufficiently material to constitute adverse employment actions may be aggregated into an "atmosphere" of adverse employment action. *See, e.g.*, *Owens v. City of New York Dep't of Educ.*, No. 17 Civ. 519 (SHS), 2021 WL 3862974, at *11 (S.D.N.Y. Aug. 30, 2021); *Garvin v. Potter*, 367 F. Supp. 2d 548, 571 (S.D.N.Y. 2005); *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 41 (E.D.N.Y. 2009) (collecting cases). Others have held that actions cannot be aggregated in the context of discrimination claims. *See, e.g.*, *Kaur v. N.Y.C. Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("It should also be noted that there is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim."); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 212 n.20 (E.D.N.Y. 2014). The Second Circuit has allowed this sort of aggregation in the retaliation context. *See Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (assessing whether minor

incidents constitute a "critical mass" such that they become a retaliatory adverse employment action). But, as discussed *supra*, the standard for an adverse employment action differs between retaliation and discrimination claims, and the Second Circuit has not explicitly addressed whether a "critical mass" theory might carry over into the discrimination context.[8] Further, there already exists a mechanism in the discrimination context by which a plaintiff can aggregate an employer's actions into a single claim: a claim for a hostile work environment which is assessed separately, as discussed *infra*.

The facts presented here, however, do not require resolution of this issue. The Court has already determined that there is a question of fact regarding whether Muniz suffered an adverse employment action with respect to his transfer to patrol, a distinct event. None of Mastronardi's other supposed acts—exclusions of Muniz from text messages and two social events and a few comments made to others—amounts to an adverse employment action. That conduct would have relevance only if somehow probative for determining whether Muniz's transfer to patrol constituted an adverse employment action. The Court cannot see how those events have any bearing on the effect of the transfer itself and whether that transfer constituted a materially adverse change in the conditions of Muniz's employment. The conditions of Muniz's employment obviously did change to some extent with the transfer, but Mastronardi's other conduct does not bear on whether that change was materially adverse. The Court therefore determines that these

---

[8] Complicating this analysis is the fact that *Phillips* was decided prior to *Burlington Northern & Santa Fe Railway Co.*, and so applied an adverse employment action standard closer to the current discrimination standard than the current retaliation standard. *Phillips*, 278 F.3d at 109 ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. We also have held that lesser actions may meet the adversity threshold, but we have not explicitly defined what quantum of lesser actions constitutes an adverse employment action." (internal quotation marks omitted)); *cf. Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 ("In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks omitted)).

other actions are not relevant to assessing Muniz's transfer to patrol except, as discussed below, in considering whether Mastronardi effected the transfer with discriminatory intent. *See* Fed. R. Evid. 401 ("Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence.").

### 2.        Inference of Discriminatory Intent

Defendants next argue that Muniz has failed to establish a *prima facie* case of either race or age discrimination because he has failed to establish that any adverse employment action took place in circumstances giving rise to an inference of discriminatory intent.  Motion at 12-13. Muniz argues that he can establish "two forms of circumstantial evidence that are each independently sufficient to infer animus: preferential treatment of similarly situated employees outside Plaintiff's protected statuses . . . and discriminatory remarks."  Opposition at 10 (citing *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  As noted, in the ADEA context, discriminatory intent based on age ultimately must be the but-for cause of the adverse employment action, *Delaney*, 766 F.3d at 168, while in the Title VII context a plaintiff must only prove "that the adverse employment decision was motivated at least in part by an impermissible reason, *i.e.*, a discriminatory reason," *Vega*, 801 F.3d at 87 (internal quotation marks omitted).

The Court begins with an analysis of similarly situated employees.  One method of showing discriminatory intent is to show disparate treatment between the plaintiff and a similarly situated employee outside of the protected group.  *See Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000))).  Such an individual must be "similarly situated in all material respects."  *Reddy v. Salvation Army*, 591 F.

Supp. 2d 406, 422 (S.D.N.Y. 2008). "What constitutes 'all material respects' varies from case to case but requires a 'reasonably close resemblance of facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.'" *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391, 403 (S.D.N.Y. 2017) (quoting *Graham*, 230 F.3d at 39). Further, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham*, 230 F.3d at 39.

Muniz has identified four potential comparators, all coworkers in the CAU who are younger than Muniz and not Hispanic: Elizabeth Warrington, Adam Donogan, Chris D'Alto, and Dave Bunyi.[9]  *See* Muniz Decl. ¶ 22.  Warrington, Donogan, and D'Alto worked in the CAU with Muniz and apparently were still working there after he left. Muniz Dep. Tr. at 48:14-50:23. Bunyi also worked in the CAU at some point, though he transferred to a different unit before Muniz's transfer. Mastronardi Dep. Tr. at 85:17-86:8; Muniz Dep. Tr. at 44:20-45:24. All four were police officers in title, like Muniz. Muniz Dep. Tr. at 45:2-6, 50:13-23. Evidence in the record suggests that the other officers in the CAU prepared reports that were similar to the shots-fired reports prepared by Muniz, but containing different content, and in fact were similar enough that one officer could prepare another officer's report if necessary. Mastronardi Dep. Tr. at 50:17-51:22 ("Q: So other police officers in the crime analysis unit—they had different reports to prepare for you than shots fired reports, correct? A: Correct. Q: What would be those other reports? A: Same thing. Spreadsheets on starting from shooting, shots fired, homicides, seven major index, robbery, rape, grand larcenies, ELAs[10], stolen car ELAs. Anything I needed. Gang members if I

---

[9] In his opposition to summary judgment, Muniz mentions a fifth comparator, Anthony Alonzo. Opposition at 10. But Muniz has not come forward with evidence showing that Alonzo is younger than Muniz or Alonzo's race.

[10] Neither Mastronardi at his deposition, nor the parties in their briefings, explain what he meant by "ELAs."

needed to see where they are at, in particular if they were arrested, violence.  Sometimes I would break down locations by spreadsheet meaning particular buildings I would have to visit, community members I had spoken to.  There was a litany of things that everything was documented on—spreadsheets to make my job a lot more simple, a lot more streamlined.  Q:  So there was like [] one police officer in the crime analysis unit that would prepare this report for you?  A:  Yes.  And if that officer was not there another officer would do it.  If let's say he is on vacation, I still needed my reports.  Somebody else would do it.").  Everyone in the CAU also appears to have reported to the same supervisor, a sergeant, who then reported directly to Mastronardi.  *Id.* at 31:16-25 ("Q:  So the sergeant was in charge of this unit, correct?  A:  Yes.  Q:  And the sergeant was the first to report to you regarding anything happening in that unit?  A:  Yes.  Q:  Did you supervise him directly?  A:  The sergeant?  Q:  Yes.  A:  For the most part, yes.").

Defendants argue that these comparators were not similarly situated because they did not have the same performance-related issues with Mastronardi that Muniz had.  Motion at 18; Reply at 7.  But the core of Muniz's claim is that Mastronardi's asserted performance issues were pretextual.  As discussed below, Muniz has provided sufficient evidence to establish a triable issue of fact that Mastronardi's performance critiques in fact were pretexts for discrimination.  The Court therefore determines that there is a genuine issue of fact as to whether the other members of the CAU are similarly situated to Muniz such that their disparate treatment may constitute circumstantial evidence giving rise to an inference of discriminatory intent, and declines to grant summary judgment in favor of the City on that basis.[11]

---

[11] Defendants' reliance on Mastronardi's transfer of Hyatt at the same time as Muniz is unpersuasive.  Motion at 18.  Hyatt apparently was forty at the time of his transfer and so, like Muniz, Hyatt was within the age range protected by the ADEA.  Defts. 56.1 Stmt. ¶ 57.  Moreover, Hyatt is not a similarly situated comparator.  He had only a few months of experience at the CAU before he was transferred, compared to Muniz's eight or nine years.  Muniz Decl. ¶¶ 37-38.  The parties also agree that Hyatt had some difficultly performing his work at the CAU, *id.* ¶ 38; Defts. 56.1 Stmt. ¶¶ 55, 60, and in fact Mastronardi testified that Hyatt "advised [him] that he couldn't

The Court also notes that additional evidence in the record, beyond the similarly situated comparators, further demonstrates that a question of fact exists as to discriminatory intent as to Muniz's age.  Muniz also has presented evidence that Mastronardi made several comments about Muniz or directed towards Muniz that could be construed as relating to his age, including Mastronardi's statement at his first precinct-wide meeting that "[f]or all you senior officers who think you are just going to sit around, wait to retire and not work, it's not going to happen," before making eye contact with Muniz, Pl. Counter 56.1 Stmt. ¶ 78; Muniz Dep. Tr. at 145:10-146:16, and Mastronardi's comments to sergeants in the precinct that Muniz had "been doing this for a long time," that he might be "interested in doing something else," and that he was "sleeping in a corner," Defts. 56.1 Stmt. ¶¶ 74-75; Muniz Dep. Tr. at 91:1-3, 140:9-24.[12]  Muniz also witnessed Mastronardi publicly berate "another senior Latino police officer in the 75th precinct who was 48 years old" for "failure to complete a task which [the officer] had previously told [Muniz] was impossible to perform," before Mastronardi transferred that officer to patrol.  Muniz Decl. ¶¶ 15-16.

---

handle the type of analytical work and data mining" involved with working for the CAU, Mastronardi Dep. Tr. at 82:18-22.  As discussed at *infra* III.C.3, the parties do dispute and present conflicting evidence regarding the quality of Muniz's performance.

These differences between Hyatt and Muniz with respect to their experience and, disputedly, job performance weaken Defendants' argument that Hyatt is more similarly situated to Muniz than other members of the CAU by virtue of his poor performance and was treated similarly. *See* Motion at 17-18.  From the evidence presented, a fact finder could determine that Hyatt's performance merited a transfer while Muniz's did not, which would contradict Defendants' argument that Mastronardi transferred only poor performers out of the CAU.  Hyatt's age presents another problem for Defendants, as a fact finder might draw an inference of discriminatory intent with respect to age from the fact that only Hyatt and Muniz, both at least the age of forty, appear to have been transferred out of the CAU for performance issues.

[12] While "stray remarks alone do not support a discrimination suit," *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (internal quotations marks omitted), Muniz has also presented comparator evidence in this case, as discussed *supra*.

Defendants' other arguments attacking the evidence of age-based animus are unpersuasive. Defendants insist that Mastronardi did not know Muniz's age at the time of his transfer, Motion at 14 (citing Defts. 56.1 Stmt. ¶ 31), but other evidence indicates otherwise. Mastronardi testified that he perceived Muniz to be older than Hyatt, Mastronardi Dep. Tr. at 112:17-20, and Hyatt was born in 1979 and so was himself approximately forty during the conduct at issue, Defts. 56.1 Stmt. ¶ 57. And even if Mastronardi did know Muniz's exact age, certain of his comments suggest he at least knew Muniz had been serving on the police force for a long time. Muniz Dep. Tr. at 145:10-146:16 (testifying that Mastronardi said, "[f]or all you senior officers who think you are just going to sit around, wait to retire and not work, it's not going to happen" before making eye contact with Muniz), 149:9-24 (testifying that Sergeant Drescher told Muniz that Mastronardi had commented that Muniz had "been doing this for a long time" and Muniz might be "interested in doing something else"). Defendants also argue that Mastronardi could not have taken age related actions against Muniz because Mastronardi himself was over forty. Motion at 14. But while claims of discrimination by someone in the same protected class as a plaintiff may be less plausible, *see Eder v. City of New York*, No. 06 Civ. 13013 (RWS), 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009); *Tucker v. New York City*, No. 05 Civ. 2804 (GEL), 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008), the Supreme Court has instructed that courts should not determine as a matter of law that one cannot discriminate against his own protected class, *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). Muniz has presented evidence of statements by Mastronardi that negatively related to his age. *See* Pl. Counter 56.1 Stmt. ¶ 78; Muniz Dep. Tr. at 145:10-146:16. Such statements, along with the other evidence previously discussed, are sufficient to create a dispute of fact as to discriminatory intent regardless of any inference against discrimination that may be drawn from Mastronardi's own age.

### 3.    Legitimate Non-Discriminatory Reason and Pretext

Once a plaintiff establishes a *prima facie* case of discrimination "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  At that stage, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  *Id.* Consequently, "[f]or the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.*  That burden for a plaintiff cannot be satisfied by producing "simply some evidence" but instead requires "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  *Id.* (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)) (internal quotation marks and brackets omitted); *see also Wharff v. State Univ. of N.Y.*, 413 F. App'x 406, 407 (2d Cir. 2011) ("If the employer carries that burden, the plaintiff can avoid summary judgment only if he comes forth with sufficient evidence to permit a rational factfinder to conclude that the employer's justification was merely a pretext and, in fact, its employment decision was based in whole or in part on discrimination." (internal quotation marks and brackets omitted)).

Defendants argue that "the record demonstrates that Inspector Mastronardi's decision to transfer Plaintiff out of the [CAU] was the result of the latter's inability to create shots-fired reports that conformed to Inspector Mastronardi's expectations."  Motion at 20.  They state first that when Mastronardi took over the 75th Precinct, he altered how members of the CAU generated their reports.[13]  *Id.*; *see* Muniz Dep. Tr. at 74:21-75:7; Mastronardi Dep. Tr. at 83:12-19.  And they

---

[13] There is some dispute between the parties as to the extent of these changes.  *See* Pl. Counter 56.1 Stmt. ¶¶ 21-22.  Muniz testified at his deposition that his three various Commanding Officers throughout his tenure differed in how they wanted him to prepare the reports.  Muniz Dep.

further state that Muniz "had a hard time augmenting himself to the new way of operating," citing Mastronardi's deposition testimony.  Motion at 20; *see* Mastronardi Dep. Tr. at 83:8-19.[14]  The Court determines that Defendants have shown a legitimate, non-discriminatory reason for Muniz's transfer.

The burden then shifts back to Muniz to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42.  Muniz may satisfy this burden "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate . . . reasons for its actions." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  Muniz does present such evidence.  Mastronardi praised Muniz's performance on his shots fired reports on multiple occasions.  Muniz Decl. ¶¶ 25-26; Muniz Dep. Tr. at 81:2-25, 84:19-85:5; Mastronardi Dep. Tr. at 106:18-20.  Moreover, from 2012 through 2019, Muniz received generally high performance scores in his evaluations.  *See* Dkts. 65-10 at 9-12; 65-13.  In particular, in 2019, Muniz received "exceptional" or "exceeds standards" in every applicable metric on his evaluation.  Dkt. 65-10 at

---

Tr. at 75:3-7 ("Q:  And did those three COs—were there any differences in how they wanted you to produce them, what they wanted them to look like, what they wanted them to say?  A: Yes.  Yeah.").  But he also testified that the reports under Mastronardi did not contain any new information, they were only formatted differently.  *Id.* at 79:13-25 ("Q: From LiPetri to Shcoll to Mastronardi you were doing different reports?  You were still doing the shots fired reports, but they looked different from each of those—A:  Yeah.  They looked different.  Same information, but pretty much yeah.  They look the way they wanted it.  Q:  Was there any information that you produced for Inspector Mastronardi's reports that you did not produce for any of your other prior commanding officer's reports?  A:  I can't think of anything.  No.  It's just the format that he wanted it.").

[14] Defendants support this testimony with additional testimony from Lieutenant Ashford and Sergeant Persson, both of whom were interviewed in connection with Muniz's Equal Employment Opportunity Division ("EEOD") complaint.  Motion at 20-21; Defts. 56.1 Stmt. ¶¶ 80, 87.  Muniz argues that these statements are inadmissible hearsay.  Opposition at 16.  Defendants respond that they are admissible under the business records exception because they were created in the ordinary course of the EEOD's investigation into Muniz's complaint.  Reply at 1.  Because the Court determines that Defendants have presented a non-discriminatory reason for Muniz's transfer regardless of this testimony, it need not resolve this dispute.

9-10.  His "rater," Sergeant Drescher, commented that Muniz "is vital to the success of the unit" and "completes any tasks asked of him with great accuracy and without hesitation."  Dkt. 65-10 at 12.  His "reviewer," Lieutenant Ashford, commented, "I concur."  *Id.*  This evidence would allow a reasonable jury to determine that Mastronardi's stated issues with Muniz's work were pretextual.[15]  Such evidence may then serve as additional circumstantial evidence probative of intentional discrimination.  *See Windham v. Time Warner, Inc.*, 275 F.3d 179, 188 (2d Cir. 2001) ("Showing the employer's proffered legitimate explanation for termination is not worthy of belief is 'one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000))); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").  Generally, such a situation creates an issue of fact for the jury at trial.  *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) ("Thus, unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine dispute and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.").

---

[15] Defendants argue that Mastronardi did not agree with these evaluations and so they do not serve as evidence of pretext.  Motion at 19-20.  But the question at present is not whether Muniz has conclusively proved that Mastronardi's reasons for the transfer were pretextual, only whether Muniz has produced sufficient evidence for a finder of fact to determine that they were. Mastronardi's previous positive comments about Muniz's work, as well as Muniz's consistently strong performance reviews in the past, are sufficient to raise a question of fact as to why Mastronardi began having problems with Muniz's work and why he would not have agreed with a strong performance evaluation.  In other words, Muniz has produced evidence that his actual performance was strong, which is sufficient to create a question of fact with respect to whether Mastronardi actually thought Muniz's performance was deficient or whether Mastronardi made such assessments with discriminatory intent.

In addition, as discussed at *supra* III.A.2 in the context of discriminatory intent for purposes of Muniz's *prima facie* case, various other evidence lends additional force to the conclusion that a question a fact exists as to whether Defendants' proffered nondiscriminatory reason is a pretext for discrimination.  As explained above, Muniz has presented evidence that Mastronardi made multiple comments at him or directed toward him that related to his age, including criticizing "senior officers who think [they] are just going to sit around, wait to retire and not work," followed by looking at Muniz, Pl. Counter 56.1 Stmt. ¶ 78; Muniz Dep. Tr. at 145:10-146:16, and commenting that Muniz had "been doing this for a long time" and might be "interested in doing something else," Defts. 56.1 Stmt. ¶¶ 74-75; Muniz Dep. Tr. at 149:9-24.

Considered all together, Muniz's evidence in support of his *prima facie* case combined with his evidence that Defendants' reasons for his transfer were pretextual, there is a genuine dispute of fact as to whether Mastronardi acted against Muniz on the basis of his race or his age. Certainly, it may be that Mastronardi's difficulties with Muniz were legitimate and entirely unrelated to Muniz's age or race.  But given the contradictory evidentiary record before the Court, it is the role of the jury to make that determination.  The Court therefore denies Defendants' motion for summary judgment as to Muniz's ADEA and Title VII discrimination claims against the City.

## D.     State and City Discrimination Claims

The NYSHRL was amended in 2019.  *See* 2019 N.Y. Sess. Laws chap. 160.  Before that point, "discrimination claims under the NYSHRL and Title VII were generally treated as analytically identical, and addressed together."  *Edelman v. NYU Langone Health Sys.*, No. 21 Civ. 502 (LGS), 2022 WL 4537972, at *14 (S.D.N.Y. Sept. 28, 2022) (internal quotation marks omitted).  As amended, however, the NYSHRL must "be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have

been so construed." N.Y. Exec. Law § 300.[16]  While New York courts have not yet produced any

substantive analysis of how this amendment changes standards of liability under the NYSHRL,

courts in this District have interpreted the amendment as "render[ing] the standard for claims closer

to the standard of the NYCHRL." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14

(S.D.N.Y. 2021).

    The NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an

employee or agent thereof, because of the actual or perceived age, [or] race . . . of any person . . .

[t]o discriminate against such person in compensation or in terms, conditions or privileges of

employment." N.Y.C. Admin. Code. § 8-107(1)(a).  "Courts must analyze NYCHRL claims

separately from any federal law claims and should construe the NYCHRL 'liberally for the

accomplishment of the uniquely broad and remedial purposes thereof.'" *Bueno v. Eurostars Hotel

Co., S.L.*, No. 21 Civ. 535 (JGK), 2022 WL 95026, at *8 (S.D.N.Y. Jan. 10, 2022) (quoting *Mihalik

v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).  To show

discrimination under the NYCHRL, a plaintiff need only show that she was "treated . . . less well,

at least in part for a discriminatory reason.'" *Khwaja v. Jobs to Move Am.*, No. 19 Civ. 7070 (JPC),

2021 WL 3911290, at *3 (S.D.N.Y. Sept. 1, 2021) (quoting *Mihalik*, 715 F.3d at 110 n.8); *see also

Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 337 (S.D.N.Y. 2021) ("[Plaintiff] brings claims

under the NYCHRL for disparate compensation, denial of promotions, and what she frames as a

hostile work environment.  For each of those claims she must show that she was treated 'less well'

on the basis of her [protected characteristic] due to Defendant's discriminatory intent.").  The

severity and pervasiveness of the defendant's conduct is "relevant only to the issue of damages"

---

    [16] This amendment came into effect on August 12, 2019 and applies to claims for
discrimination accruing after that date, including Muniz's termination in January 2020.  *See
Matthew v. Tex. Comptroller of Pub. Accounts*, No. 21 Civ. 5337 (JPC), 2022 WL 4626511, at *10
(S.D.N.Y. Sept. 30, 2022).

and "the challenged conduct need not even be 'tangible' (like hiring or firing)." *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38 (1st Dep't 2009) and quoting *id.* at 40).  It is sufficient to show "differential treatment of any degree based on a discriminatory motive." *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014).

Ultimately, because the NYSHRL's requirements for discrimination claims are either identical to or more lenient than federal law claims, depending on the time the claim accrued, and because the NYCHRL's requirements are more lenient still, the Court denies the motion for summary judgment with respect to Muniz's NYSHRL and NYCHRL discrimination claims because it has already denied the motion with respect to his federal discrimination claims against the City, which were based entirely on Mastronardi's conduct.

## E.     Federal Hostile Work Environment Claims

To prevail on a federal hostile work environment claim, a plaintiff must show conduct that "(1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's" protected characteristic. *Everett v. N.Y.C. Dep't of Educ.*, No. 21 Civ. 7043 (JPC), 2022 WL 2342693, at *7 (S.D.N.Y. June 29, 2022) (ellipsis in original) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)); *see also Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (applying this standard at summary judgment to an ADEA claim).

"A hostile work environment is created '[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Moore v. DeJoy*, No. 18 Civ. 9967 (JPC), 2021 WL 4523503, at *5 (S.D.N.Y. Sept. 30, 2021) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). To determine whether an environment is "hostile" or "abusive," a court considers "all the

circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The hostile work environment may result from "a single incident [that] was extraordinarily severe, or . . . a series of incidents [that] were sufficiently continuous and concerted to have altered the conditions of [the plaintiff's] working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). But "[i]solated incidents or 'episodic' stray remarks are not 'sufficiently continuous and concerted in order to be deemed pervasive.'" *De Figueroa v. New York*, 403 F. Supp. 3d 133, 160-61 (E.D.N.Y. 2019) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

Defendants argue that Muniz has failed to establish a hostile work environment both because no inference of discriminatory motivation can arise on the current record and because the complained of conduct was not severe and pervasive enough to constitute a hostile work environment. Motion at 22-23.

The Court has already determined that there are genuine issues of fact as to Defendants' motivations. As for the severity and pervasiveness of Defendants' conduct, evidence in the record may establish at trial that over the course of approximately nine months Mastronardi made a hostile comment at a precinct meeting just before making eye contact with Muniz, Pl. Counter 56.1 Stmt. ¶ 78; Muniz Dep. Tr. at 145:10-146:16, made two comments behind Muniz's back about his performance, Defts. 56.1 Stmt. ¶¶ 74-75, twice excluded him from social events, *id.* ¶¶ 48, 50-51, excluded him from work related text messages up to twenty-three times, Pl. Counter 56.1 Stmt. ¶ 18, and ultimately transferred him, Defts. 56.1 Stmt. ¶ 26. The Court has already determined that there is a question of fact as to whether Muniz's transfer constitutes an adverse employment action. But that transfer is more properly considered in the context of a discrimination claim rather

31

than as part of a hostile work environment because it constitutes a discrete employment decision. *See Littlejohn v. City of New York*, 795 F.3d 297, 313-14, 321 (2d Cir. 2015) (treating separately discrimination claim based on demotion and hostile work environment claims); *Cardwell v. Davis Polk & Wardwell LLP*, No. 19 Civ. 10256 (GHW), 2020 WL 6274826, at *27 (S.D.N.Y. Oct. 24, 2020) (treating discrimination claim for termination separately from hostile work environment claim and describing the conceptual difference between the two types of claim). The remainder of the conduct at issue in this case is not sufficiently severe or pervasive to constitute a hostile work environment. Other than two comments, *i.e.*, that "senior officers" were not going to be allowed to "wait to retire and not work," *see* Muniz Dep. Tr. at 145:10-146:16, and that "Johnny's been doing this for a long time," *id.* at 149:9-24, none of the other conduct has any facial relation to Muniz's age or race. The Second Circuit has held that significantly more severe and pervasive facially neutral conduct than that experienced by Muniz could not form a hostile work environment claim.[17] *See Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118-19 (2d Cir. 2010) (holding that a single openly racial incident, in addition to actions by the defendants towards the plaintiff in which they "wrongly excluded her from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her" was insufficient to establish a hostile work environment); *see also Littlejohn*, 795 F.3d at 321 (affirming dismissal of a hostile work environment claim based on allegations that the plaintiff's supervisor made negative comments about her, used harsh tones with her, wrongfully reprimanded her, replaced her at meetings, and increased her reporting schedule). The Court therefore grants Defendants' motion to dismiss with respect to Muniz's federal hostile work environment claims against the City.

---

[17] The Court notes as well that these supposed comments by Mastronardi appear to refer directly only to officers' experience and therefore are a step removed from references to their age.

F.      **State and City Hostile Work Environment Claims**

The 2019 NYSHRL amendment also specifically altered the standards for hostile work

environment claims.  Previously, such a claim would have been brought under section 296(1)(a)

of that statute.  *See, e.g.*, *Mejia v. T.N. 888 Eighth Ave. LLC*, 95 N.Y.S.3d 168, 170 (1st Dep't

2019).  The 2019 amendment added a new provision, codified at section 296(1)(h), which makes it

> an unlawful discriminatory practice . . . [f]or an employer, . . . to subject any
> individual to harassment because of an individual's age, race . . . [or] national
> origin . . . regardless of whether such harassment would be considered severe or
> pervasive . . . .  [S]uch harassment is an unlawful discriminatory practice when it
> subjects an individual to inferior terms, conditions or privileges of employment
> because of the individual's membership in one or more of these protected
> categories.

NYSHRL § 296(1)(h).  This has the effect of eliminating any requirement that "harassing or

discriminatory conduct be 'severe or pervasive' for it to be actionable and [adopted] instead a more

protective standard that prohibits conduct that results in 'inferior terms, conditions or privileges of

employment.'"  *Maiurano v. Cantor Fitzgerald Sec.*, No. 19 Civ. 10042 (KPF), 2021 WL 76410,

at *3 n.2 (S.D.N.Y. Jan. 8, 2021) (quoting NYSHRL § 296(1)(h)).  This provision, however, only

took effect on October 11, 2019.  *See Matthew*, 2022 WL 4626511, at *10.  The conduct at issue

in this case ranges in time from May 2019 to January 2020 and so takes place partially before and

partially after the NYSHRL amendments came into effect.  *See Europe v. Equinox Holdings*, *Inc.*,

No. 20 Civ. 7787 (JGK), 2022 WL 4124763, at *7 n.10 (S.D.N.Y. Sept. 9, 2022) (noting that

"courts agree that the amendments do not apply retroactively").  Because Defendants have not

addressed the effect of these amendments on Muniz's NYSHRL hostile work environment claim,

treating it as identical to a federal claim, Motion at 22, and because the parties generally have not

briefed this issue, the Court denies Defendants' motion for summary judgment as to Muniz's

NYSHRL hostile work environment claim.

The standard for a claim for a hostile work environment under the NYCHRL does not differ

from the standard for a claim of discrimination.  *See Verne v. N.Y.C. Dep't of Educ.*, No. 21 Civ. 5427 (JPC), 2022 WL 4626533, at *17 (S.D.N.Y. Sept. 30, 2022).  Because the Court has already denied the motion for summary judgment with respect to Muniz's NYCHRL discrimination claim, it denies it with respect to his NYCHRL hostile work environment claim as well.

## IV.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  The Court grants the motion with respect to Muniz's OWBPA claim, any Title VII and ADEA claims for discrimination and any federal hostile work environment against Mastronardi, and his federal hostile work environment claim against the City.  The Court denies the motion with respect to the remaining claims for discrimination under Title VII and the ADEA against the City and with respect to his claims for discrimination and a hostile work environment on the basis of age and ethnicity under the NYSHRL and NYCHRL against both Defendants.  By October 10, 2023, the parties shall inform the Court whether they believe that a referral to the court annexed mediation program or to the Honorable Jennifer Willis, United States Magistrate Judge, for settlement discussions would be helpful in this case.  If not, the Court will set a date for a pretrial conference to set a trial date.  The Clerk of Court is respectfully directed to close the motion pending at Docket Number 85.

SO ORDERED.

Dated:  September 26, 2023
       New York, New York                    _____
                                             JOHN P. CRONAN
                                             United States District Judge